**J. B. STREETER, Respondent, v. CHARLES E. ARCHER and Hattie Archer, Appellants.**

(176 N. W. 826.)

**Specific performance — denied where contract without adequate consideration or one obtained by misrepresentations, etc.**

In an action by plaintiff to compel specific performance of an alleged optional contract for the sale of land it is *held:* Specific performance should be denied it appearing there was no consideration for the contract; and for this and other reasons set forth in the opinion specific performance is denied.

Opinion filed February 11, 1920. Rehearing denied March 9, 1920.

Appeal from the District Court of Ramsey County, Honorable C. W. *Buttz,* Judge.

Judgment reversed.

*L. J. Wehe,* for appellants.

A voluntary executory agreement is not enforced in equity, and the fact that the memorandum of the contract states a consideration is immaterial; the fact that no consideration exists may always be shown. 36 Cyc. 544, 608; Comp. Laws 1913, § 5872.

There must be some consideration for the option to render it more than an offer revocable before acceptance, but the amount of the consideration is generally immaterial. 36 Cyc. 626; 9 Cyc. 309; 13 C. J. p. 312.

There is no mutuality of obligation where one party's obligation is not definite and certain. Comp. Laws 1913, § 5857; 1 L.R.A.(N.S.) 445; 9 Cyc. 327; Kaster v. Mason, 13 N. D. 107, 99 N. W. 1083.

*Cuthbert & Smythe,* for respondents.

"Specific performance may be compelled though contract signed only by one." Biddow v. Flagg, 22 N. D. 53, 132 N. W. 637; Nier v. Hadden, 148 Mich. 488, 111 N. W. 1040; Morgan v. Russell, 24 N. D. 490, 43 L.R.A.(N.S.) 1150, 144 N. W. 99.

The defendants claim they entered into the contract, Ex. 1, by mistake or misapprehension; they must prove this by evidence that is "clear, convincing, and satisfactory." See 34 Cyc. 984; Fritz v. Fritz, 94 Minn. 264, 102 N. W. 705; Kinyon v. Cunningham, 146 Mich. 430, 109 N. W. 675; Wilcox v. S. Wicker, 129 Iowa, 151, 105 N. W. 392; Misses v. Baldwin, 262 Ill. 48, 104 N. E. 195; Metropolitan Loan Asso. v. Esche, 75 Cal. 513, 17 Pac. 675.

GRACE, J. This is an action to compel the specific performance of a certain alleged contract, relative to certain real property. On account of the uncertainty as to the real nature and meaning of the contract, it is deemed advisable to set it forth in full. It is as follows:

"For and in consideration of the sum of $1 to me in hand paid, and other valuable consideration received by me from the second party, I, the subscriber, as first party, hereby offer to sell and convey by warranty deed or by contract for deed to J. B. Streeter, of Devils Lake, North Dakota, as second party, the following described premises for

the sum of $11,000, purchase price, on the following terms, *viz.:* Two thousand dollars upon acceptance of this option by second party, balance payable, $2,000, ninety days after date of first payment, and balance of $7,000, if desired, can be on one half of the crop contract now held by me on within described land, which contract provides that I shall turn in one half the crop each year until the land is paid for and draws 7 per cent interest; to wit, the south half of the northeast quarter and lots one and two of section 4, and the west half of the northwest quarter of section No. 3, in township No. 153, N., of range No. 65, in Ramsey county, North Dakota, together with all crops on above-described lands, should first party harvest the crop on within land, said second party or the purchaser of the land is to pay him for work of harvesting, hauling, or whatever work is done by first party in caring for the harvesting and marketing of all said crop.

"An abstract of title to said above-described property showing marketable title in first party, at his own cost and expense, shall upon request be furnished at once to second party.

The said second party shall have at least six months within which to accept this proposal, and thereafter until said first party shall give second party written demand that said proposal be accepted within ten days from date of the service of such demand upon said second party, and unless so accepted this proposal shall become null and void, provided that said abstract, if so requested, shall have been furnished at the time (showing good and marketable title) or prior to such demand.

"On account of second party being to continually large expense in advertising and maintaining his organization and general expenses in his business of getting his proposed buyers for land, said first party agrees to maintain to prospective purchasers the asking price said second party may put on within described property, and to help along said second party's sale of same.

"All payments of purchase price shall be made under this optional offer at the offices of J. B. Streeter, Inc., and as soon as made shall be construed to be an acceptance of this offer by the second party without further notice.

"The second party on making the payment of purchase, as aforesaid, may deduct therefrom the amount of whatever is required to pay off all encumbrances against said premises, and the first party agrees to

execute at once and deliver to the said J. B. Streeter, Inc., to be deliv•
ered to the second party, together with said abstract, a warranty deed
or contract for deed of said premises, or to whomsoever second party
shall direct, as grantee, the consideration expressed in which deed or
contract for deed shall be such sum as second party shall direct, and
turn over the possession of the same to the second party or his assigns.
Said first party also agreeing to assign without cost any and all insur•
ance there may be on within-described property at date of this option
or taken out subsequent thereto, assigning same to whoever said second
party may direct, and delivering all said insurance papers or policies
with the deed or contract as above provided for.

"On acceptance of this offer by the second party, and on furnishing
the abstract of title showing good and marketable title in first party,
and executing the deed of conveyance by the first party, as aforesaid,
and not before, the said J. B. Streeter, Inc., shall pay over to the first
party the money paid it as purchase price as aforesaid.

Dated this twenty-eighth day of May, 1918.

"Witnesses:                              "Charles E. Archer,
    "E. W. Cunningham.                "Hattie Archer."
    "C. A. Stotlar."

The defendants had purchased, by contract for deed, from George
Meiklejohn, in the year 1912, the land in controversy, for $12,000,
$4,700 of which was to be paid down, and $7,300, the balance, to be
paid by the delivery to Meiklejohn, of one half of the crops to be
raised upon the land in the succeeding years. It was further pro-
vided that the defendants could make no valid assignments of the
premises or any part thereof, or of said contract, unless the consent of
the first party (Meiklejohn) should be indorsed on or attached to the
contract or pledge, if any, etc.

J. B. Streeter is a real estate dealer, residing at Devils Lake. There
were two corporations bearing his name; namely, J. B. Streeter, Inc.,
and The J. B. Streeter Corporation.

The alleged contract in controversy is between Charles E. Archer and
Hattie Archer, his wife, and J. B. Streeter as an individual. It is
signed by the defendants only.

The defendants claim it was procured from them, by the plaintiff,

through fraud and trickery. The defendants, who lived on the farm and farmed it for more than six years, claim that, in May, 1918, while the defendant was seeding, J. B. Streeter, the president and general manager of the two corporations, organized for the purpose of dealing in real estate, came to his farm to list the same for sale. At that time, there was no agreement made. Archer claimed that he told them he would sell the farm for $12,000, and pay commission of $1,000, for sale of the same.

On May 28, 1918, J. B. Streeter sent out one of the employees of the corporation, and got Mr. Archer to come into the office. They went into Streeter's private office, where Archer again told Streeter the terms upon which he would sell. The defendant claims that J. B. Streeter was carrying on a campaign for the sale of real estate, in the name of J. B. Streeter, Inc.; that there was a large electric sign out in front, with that name on it, and the name appeared in large letters on the windows.

He claims from that, and from what Streeter had told him, he thought he was dealing with J. B. Streeter Corporation. Nothing was said as to the time the listing contract would expire. Streeter drew up and prepared a contract, and procured Mr. Archer's signature to it without him reading it over, and on the same day the wife signed it without reading it over. No consideration of any kind was paid at the time of the signing of the contract. The defendant received no copy of the same, and thought he was signing a listing contract.

Sometime prior to July 15, 1918, Archer went to see Streeter, and no buyer for the land, up to that time, had been procured. Between the 15th and 20th of July, 1918, Cunningham and Stotlar, employees of the corporations, brought out the first party to look at the land, neither of whom wished to buy it. It was during some of the conversation, in regard to the price of the land, between these prospective purchasers, and the agents of the corporations, in the presence of Archer, that he became convinced there was something wrong in regard to the listing contract, which he had signed; that is, he claimed they were getting different prices than those agreed to by him.

He claims that he thought he was dealing with J. B. Streeter Corporation, and that Streeter so told him, at the time he signed the con-

tract; that he was deceived as to the character of the contract, and as to with whom he was dealing with.

On about August 10, 1918, J. B. Streeter, as an individual, served notices upon the defendant, that he elected to purchase the farm, and exercise the alleged option, in the alleged contract, to purchase, and at that time, served a notice of an alleged deposit having been made by J. B. Streeter as an individual, with J. B. Streeter, Inc., in the sum of $2,000; that the alleged deposit was made by J. B. Streeter as an individual, with J. B. Streeter as president and general manager of the J. B. Streeter, Inc., by depositing the same in the safe belonging to J. B. Streeter, Inc.

Streeter was the only party in possession of the combination of the safe. If the money were deposited in the safe, it did not remain there all the time; J. B. Streeter took it out, at different times.

J. B. Streeter Corporation kept a separate set of books, but no record or entry was made in any of the books of that corporation, nor is there any evidence, nor entry of any kind in writing, that such deposit had been made with J. B. Streeter, Inc. No other deposit of any kind was made, nor any offer to pay the Archers the expense of harvesting and cutting the crop.

One Richardson claims to have purchased the premises from J. B. Streeter Corporation, under the terms of exhibit 4. The alleged option contract was with J. B. Streeter personally, and it was not assigned to either of the corporations. The Archers had no dealings with Richardson, and refused to have anything to do with him.

Shortly after August 10, 1918, after notice had been served upon Mr. Archer, Meiklejohn, from whom he purchased the land, came to see him, and procured his consent to go in and see if Streeter would deposit $2,000 in some bank, and then go through with the matter. Archer consented to this, and they went to Streeter's office, and Mr. Meiklejohn, the holder of the title of the land, told Streeter, if he would deposit the money in some bank in Devils Lake, they would close the deal. Mr Streeter refused to do this. Meiklejohn refused to have any further dealings with Streeter, and refused to make transfer of the contract, or allow Archer to transfer it. It clearly appears there was no ratification of the contract.

After Archer had finished threshing the crop upon the land, which

amounted to more than $8,000, Streeter commenced this action to enforce specific performance of the alleged contract, J. B. Streeter was not financially responsible, and the corporations were not in much better financial condition than he, though it appears that one of them did have some office furniture and fixtures, and perhaps some other small property,—all of which was mortgaged.

A detailed list of the debts owing by the J. B. Streeter Corporation appears in the testimony. It appears that the safe and adding machine were mortgaged to some of the creditors; it appears that a suit was brought by one Jorgenson against Streeter personally and J. B. Streeter Corporation, and garnishment and attachment proceedings as well; it further appears that one Sheldon went to Streeter, and said that he heard he was going to pieces; that he said, there was the electrical sign, and that he was going to take it, unless he got the difference, meaning, perhaps, what was owing him. He did take the sign. There is no need to refer specifically to all the evidence in regard to the financial condition of J. B. Streeter and the corporations.

We are of the opinion, for several reasons, that specific performance should not be granted.

Section 7198, Comp. Laws 1913, provides, in substance, "that specific performance of the contract cannot be enforced against a party to it, if he has not received an adequate consideration; if it is not, as to him, just and reasonable; if his assent was obtained by misrepresentation, concealment, circumvention, or unfair practice of any party to whom performance would become due under the contract; or, by any promise of such party, which has not been substantially fulfilled, or if his assent was given under the influence of mistake, misapprehension, or surprise."

All of such provisions are applicable to this contract.

The defendants, at the time they signed the contract, received no consideration, and there is no sufficient showing that they received any other valuable consideration. There was no consideration for the contract.

The plaintiff had agreed to do nothing; had in no manner legally bound himself by signing the contract, or agreeing to any of its provisions, in such a manner as to be bound thereby.

46 N. D.—17.

The testimony is clear that the defendants agreed to list the land for $12,000. That was their price, while the contract shows it to be $11,000. The defendants had a perfect right to state the amount which they were willing to take for their land, and also the amount which the plaintiff should have for selling the same. Thus, this prior parol agreement was really the inducing and moving cause of the alleged written contract.

In the case of Erickson v. Wiper, 33 N. D. 206, 157 N. W. 596, there was quoted with approval, the following language, which appeared in the decision of the case of De Rue v. McIntosh, 26 S. D. 42, 47, 127 N. W. 532, as used by the supreme court of that state, in construing a statute of South Dakota, identical with § 5889, Comp. Laws 1913.

"This provision of our Code embodies the common law upon the subject of written contracts, and, while the execution of the contract, in writing, whether the law requires it to be written or not, supersedes all oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instruments, nevertheless, as contended by the appellant, there are exceptions to the rule. And one of the exceptions seems to be that agreements or representations made prior to the written contract, under which the party was induced to sign the contract, may be shown; in other words, where the parol contemporaneous agreement was the inducing and moving cause of the written contract, or where the parol agreement forms part of the consideration for a written contract, and where he executed the written contract, upon the faith of the parol contract or representation, such evidence is admissible."

From the testimony of the defendant, it is clear he thought he was signing a listing contract, whereas, the alleged contract which he did sign is of the nature of an option contract, and, while laboring under this mistake, he signed the alleged contract, believing it to contain the terms which had been agreed upon.

The plaintiff must have well known that defendant intended a listing agreement, and it was an unfair practice, concealment, and circumvention on the part of the plaintiff, to procure the alleged contract, in view of what the defendant had stated to him, as to the terms upon which the land might be sold, and as to the commissions which he would be willing to pay the plaintiff in case he sold upon those terms.

The alleged contract which plaintiff procured from defendant must be held to be of no effect or validity, either as an option contract or listing agreement; for, though defendant may have intended to give a listing agreement, none was executed, and hence there was no listing of the land, as an option contract it was wholly invalid for the reasons above stated.

It thus was signed under a mistake of fact, and hence there was no free or mutual consent of the defendants to the contract.

Section 5842, Comp. Laws 1913; Orth v. Procise, 38 N. D. 580, 165 N. W. 557.

The office of J. B. Streeter and J. B. Streeter, Inc., and J. B. Streeter Corporation was all one. All the business, if any, was transacted in the one office. In this office, there was a safe used by J. B. Streeter, Inc., and J. B. Streeter. Streeter is the only one who had the combination of the safe. In it, Streeter kept part of his personal papers. He claims he had $2,000; that he called Mr. Smythe down to show it to him, but that Smythe did not count the money; that Streeter put it in an envelop and put it in the safe of J. B. Streeter, Inc., for the purpose of complying with the terms of the alleged contract.

There is testimony to show that the money, if it ever were placed there, did not remain in the safe all the time; that Streeter took it out two or three times, and put it in his pocket, but claims to have returned it.

Smythe testified that, before the commencement of this suit, the $2,000 was turned over to him; that he had brought it with him into court.

J. B. Streeter, Inc., has no record of the transaction in any of its books. No other record seems to have been kept of it, except that it is claimed to have been placed in the safe by J. B. Streeter, as above stated.

We are of the opinion that the evidence, as a whole, shows there was no deposit, in good faith, of the money, with J. B. Streeter, Inc., and we hold there was none. We think it fully appears, from the record, that J. B. Streeter, Inc., J. B. Streeter Corporation, and J. B. Streeter, were all, practically speaking, insolvent.

This bad faith is further demonstrated by the fact that defendant and Meiklejohn were refused the deposit of the money, as above shown.

The testimony further clearly shows that, long before Streeter sought to exercise his alleged option, the defendant had repudiated and canceled it. He testifies that, on the 20th day of July, 1918, he went to the office of J. B. Streeter, Inc., and asked to see the contract; that he saw Streeter and got the contract and read it over, and told him he would like to have a copy of the contract, which he gave him; and that he then told Streeter that that is not the agreement I signed, or that he entered into; that he then told him that he would not be bound by it, and that Streeter said, "All right;" and that he, defendant, understood, from that time, there was not any agreement. We are of the opinion the alleged contract was thus, by the mutual consent of the parties, canceled and terminated. Afterward, when Streeter came out to the place, defendant ordered him off, and also ordered his men off the place. This took place sometime in August.

The testimony shows that nothing more was heard from Streeter until plaintiff had practically harvested the crop and had it practically all threshed, when the written notice was served, by Streeter, upon defendant, notifying him of the alleged deposit of money, and demanding performance, etc.

The trial court, in its memorandum opinion, has placed much stress upon the alleged written contract and the failure of the defendants to read it over, they both being familiar with the English language.

As we view the matter, there was no contract. Where there is no consideration, there is no contract. The minds of the parties never met in a contract. The defendants' assent to the contract was given under mistake and misapprehension, as more clearly appears from what has been stated above. Specific performance of such a contract may not be enforced.

Streeter agreed to nothing in the contract. He did not agree to pay a down payment of $2,000, nor the $2,000 ninety days after the date of the first payment, nor did he agree to assume the balance of $7,000, under the contract. He, in no manner, bound himself absolutely by the payment of any money, or by the making of any promise, in writing or otherwise.

The most that can be said of it, if it had been drawn so as to contain the contemporaneous parol agreement of the parties, with reference to the terms upon which such land might be sold, as testified to by

Archer, is that it would then have been an offer to sell, and to pay the plaintiff a stated sum for making the sale.

The rule is well settled that where written contract is entered into between the parties, and each agree to the matters therein contained, the contract being for a sufficient consideration, and having been entered into without any fraud, deception, circumvention, or deceit having been practised by either party, and where no contemporaneous parol agreement was the inducing cause of the written contract, and which is not therein contained, and where the parties can read, and have opportunity to do so, and thus understand the contract, and where such contract is not void for want of mutuality or free assent of the will to its terms, and where it is complete and its terms unambiguous, it constitutes the highest evidence of the terms of the agreement, and, as a general rule, parol testimony will not be admitted for the purpose of varying the terms of the written instrument.

The plaintiff cannot be heard to assert, against the defendants, the principle of estoppel. The alleged sales of the land by plaintiff, to other parties, in no manner concern defendants, for they were not a party to them, and had no connection with them.

The plaintiffs in this case, after procuring the alleged contract, in the manner above stated, in which he in no manner bound himself to do anything, never attempted to do anything, with reference to making a binding contract, until several months after the date of the alleged contract, when a magnificent crop, of the value of more than $8,000, was securely harvested and threshed by the defendants, and when it was apparent that the crop would be equivalent in value to the greater share of the purchase price mentioned in the alleged contract. It was then, and then only, that he became active, in serving notice that he elected to purchase the land, and became active in the making of the alleged deposit.

The doing of these things, however, as we have seen, availed nothing and this for the reasons above stated. It is clear, for all the reasons above stated, that specific performance of the contract should be denied.

It is denied. The judgment of the District Court appealed from is reversed and the case is remanded, and such action should be dismissed. It is so ordered.

The appellant is entitled to statutory costs and disbursements on appeal.

ROBINSON and BRONSON, JJ., concur.

BIRDZELL, J. (concurring). I concur in the holding of the court that the plaintiff and respondent is not entitled to a specific performance of the contract, but for reasons other than those stated in the majority opinion. With due respect to the opinion of the majority, I find my views to be at variance with those expressed in the opinion of Mr. Justice Grace, both as to some of the facts and as to the legal conclusions drawn from the facts therein stated. I am of the opinion that the evidence shows the so-called option contract to have been fairly entered into; that it stated the substance of the understanding between the parties with reference to the terms upon which Archer was willing to dispose of his land; and that the purchaser sufficiently manifested his desire to purchase within the time specified in the option or offer.

I am further of the opinion that the facts stated with reference to the financial responsibility of J. B. Streeter or the J. B. Streeter Corporation are foreign to any issue in the case, and should not be considered as having any bearing, for the reason that it affirmatively appears in the record that the plaintiff was able to comply with all of his obligations, and that the rights of the defendant could be amply protected in the decree or judgment. In fact the money due was tendered in court. Even if it should be conceded that the plaintiff is insolvent, this would furnish no reason for denying him specific performance, as this remedy is allowable to all on equitable terms regardless of their financial responsibility.

It is said that all of the provisions of § 7198, Comp. Laws 1913, are applicable to the specific performance of the contract in question, but as I view the facts this section is in no wise applicable. It may be conceded that there was no consideration paid for the so-called option contract, in which event it would not amount to a binding, irrevocable, continuing offer on the part of Archer to sell his land for the price stated. But it would still amount to a continuing offer which would result in a contract if accepted within the time therein limited, and under the evidence it seems to me that it was so accepted. It is therefore

immaterial whether any consideration was paid at the time the option contract—listing agreement or offer (whichever it may in fact be)—was signed by the defendants. See 25 R. C. L. p. 236. There it is said: "By his election to accept and exercise the option, the contract becomes binding on the holder, and any objection to its enforcement on account of want of mutuality is removed." For purposes of the remedy sought by the plaintiff in this case, and for purposes of the application of the statute (§ 7198), the term "adequate consideration" relates only to the consideration for the sale, and not to the consideration for an option preceding the sale, if such existed. "The inadequacy of consideration for an option to purchase real estate cannot defeat the right to performance of the contract to convey after the option has been accepted, if the price to be paid for the land is adequate." 25 R. C. L. 237. Under the evidence in this case there could be no question of the adequacy of the consideration agreed to be paid by the purchaser, for it corresponds exactly with what the sellers understood they were to obtain. They themselves admit it in their own testimony. They were to receive $11,000 net for the land, and if they regarded this as an adequate consideration it should not be otherwise regarded by the court. For manifestly, remedies upon contracts, when fairly made, proceed upon the basic principle that parties are free to make such contracts as they choose. It is well-settled that an option contract is specifically enforceable at the instance of the one who avails himself of the option. 36 Cyc. 625; 25 R. C. L. 237. "In fact," says Pomeroy, "mutuality has nothing to do ordinarily with contracts of option. The option is only a binding offer. The promisor has parted with the right to withdraw his offer. There is nothing to enforce in equity before the exercise of the option, as the promisee has already obtained his right,—to have the offer kept open. Upon the exercise of the option, i. e., the acceptance of the offer—and the filing of the bill by the promisee would be one way of exercising it,—the option ceases as an option, and equity has an ordinary bilateral contract to deal with." 5 Pom. Eq. Jur. § 2195 (§ 773). The promisee thus ordinarily renders himself subject to a like remedy at the suit of the adverse party.

It is equally well settled that specific performance will not be denied merely because circumstances arising subsequently and anterior to the time of its performance render the subject-matter of much greater value

to the purchaser. Pom. Eq. Jur. § 2219 (§ 797); 25 R. C. L. 254; 36 Cyc. 616, 617. It clearly appears in this record that at the time the first negotiations were had the parties looked forward to the contingency of the crop; for it was expressly provided in the contract or offer signed by the defendants that, in case of purchase, the plaintiff or the purchaser was to pay the defendants for the work of harvesting and hauling, or whatever work was done by them in the harvesting and marketing of the crop. Archer himself testified that at the time he listed the land with Streeter, that he (Streeter) wanted him to throw in the crop, and, to use Archer's own words, he said: " 'I will throw in half of it,' and he [Streeter] said, 'No, I won't take it that way, it is not worth it, if you will throw in all of it may be I can do something with it,' and I said, 'I do not want to give all the crop, but if you can sell that way I will list it with you.' " It is clear, then, that Archer understood that he was selling both the land and the crop, and any provision in the agreement giving him a right to be reimbursed for the work and expense prior to the sale would be in his favor. Such provision is made in the contract, as above indicated. I am of the opinion that the so-called option contract amply evidenced the true agreement of the parties with respect to the crop. It would follow from what has been stated that, upon acceptance by the plaintiff, there was a mutually binding contract for the sale of the land.

From the fact that a mutually binding contract exists, it does not follow, however, that it is one that should be specifically enforced. While I see no element of unfairness, fraud, hardship, inadequacy of consideration, or lack of mutuality of obligation present, which would deprive the plaintiff of the remedy of specific performance, it is quite apparent, in my opinion, that there is lacking the element of mutuality of remedy, such as is required under our statute as previously construed and applied by this court. Section 7200 provides that an agreement for the sale of property cannot be specifically enforced in favor of a seller who cannot give to the buyer a title free from reasonable doubt, and § 7193 provides:

"Neither party to an obligation can be compelled specifically to perform it, *unless the other party thereto has performed, or is compellable specifically to perform everything to which the former is entitled under*

*the same obligation,* either completely or nearly so, together with full compensation for any want of entire performance."

In the case of Knudtson v. Robinson, 18 N. D. 12, 118 N. W. 1051, this statute was construed as preventing specific performance in favor of the purchaser, where the vendor could not have compelled specific performance by reason of his inability to alone enter into a contract for the sale of a homestead. Under the contract in that case Robinson, the defendant, had agreed to sell 960 acres of land, 320 of which was a homestead. In commenting upon the lack of mutuality of remedy under the statutes above quoted, this court, speaking through Chief Justice Morgan, said:

"Since Robinson could not enforce specific performance against Knudtson under the facts of this case, specific performance could not be enforced by Knudtson against Robinson. There must be mutuality of obligation and remedy between the parties before specific performance is enforceable against either, except in cases where there has been performance by the party seeking to enforce specific performance. This is a statutory principle in this state, as laid down in § 6610, Revised Code, 1905 (id. § 7193, Comp. Laws 1913)."

After quoting the statute, the discussion continues:

"The remedy must be reciprocal. Performance by the party seeking to enforce performance under this section of the Code entitles such party to have the contract specifically enforced, although there was no mutuality of remedy when the contract was entered into. So far as the enforcement of contracts that are not mutual, as to obligation or remedy, this section is only a declaration of the common-law rule on this subject. Pederson v. Dibble, 12 N. D. 572, 98 N. W. 411.

"The appellant contends that an offer of performance satisfies the requirement of the statute, and that, by tendering and bringing into court the sum claimed to be actually due under the contract, the nonmutuality of the contract is rendered immaterial. The language of the section is explicit, that performance or the right to compel substantial performance of the contract must be shown before contracts that are not mutual can be specifically enforced. 'Performance' is a word of settled meaning, and means the doing or completing of an act. 'An offer to perform' and 'performance' are not synonymous in meaning. Without performance the party seeking enforcement of the contract is

not within the provisions of the statute when he has tendered performance or simply shown a willingness to perform. Crumbly v. Bardon, 70 Wis. 385, 36 N. W. 19; Lattin v. Hazard, 91 Cal. 87, 27 Pac. 515."

It is clear that in the instant case the plaintiff has not performed. The mere deposit of the money at the office of the Streeter Corporation, at the place where the money was payable, only amounts to a tender, and not to a performance. It does not discharge the obligation to pay. This could only have been done by complying with the statute relating to the extinction of obligations. Section 5815, Comp. Laws 1913, states the requirements in this respect. It reads:

"An obligation for the payment of money is extinguished by a due offer of payment, if the amount is immediately deposited in the name of the creditor with some bank of deposit within this state of good repute, and notice thereof is given to the creditor."

This statute was not complied with and it is clear that nothing more was done by the plaintiff than to offer to perform or tender performance. This was expressly held in Knudtson v. Robinson, supra, not sufficient to satisfy the statute.

But the statute obviates the necessity of performance by the plaintiff as a prerequisite, where the defendant is "compellable specifically to perform everything to which "the other party is entitled under the same obligation, with allowance for compensable deficiencies. Archer purported to bind himself under this contract "to sell and convey by warranty deed or by contract for deed to J. B. Streeter," and to place his warranty deed or contract with "J. B. Streeter, Inc.," at once for delivery either to the second party (J. B. Streeter) or to whomsoever the latter should direct, and no portion of the purchase-price money paid to J. B. Streeter, Inc., was to be paid over to the defendant until the "furnishing of the abstract of title showing good and marketable title in first party and executing the deed of conveyance by first party." It is clear, under the facts appearing in this record, that Archer never had a marketable title to the land in controversy. He had only an equitable title under a contract for deed, which, according to its terms, was not assignable without the consent of the owner of the legal title. He expressly contracted to sell more than he had to sell, and it is obvious that he could not be compelled to transfer a title which he could not acquire without the consent of a third party. See Norris

v. Fox, 45 Fed. 406. Under the record in this case it is clear that Archer was not selling his mere equity in the land. Indeed, it appears that the plaintiff is attempting, in this proceeding, to obtain more than Archer's equity; for, though Meiklejohn, the owner of the legal title, is not made a party to the action, an attempt is made, through the filing of affidavits, to direct the application of a portion of the consideration of money to the discharge of his claims. In fact, findings are made which purport to adjudicate rights between Archer and Meiklejohn, the court reserving, however, the right to make the latter a party. The plaintiff has not shown himself to be willing to accept what Archer could transfer. In these circumstances the vendor is not estopped or precluded from asserting his inability to perform to the extent demanded. Whatever might be the case, if Archer had acquired a marketable, legal title before this action was begun, it seems that there is no room to doubt that so long as he did not have the character of title which he was contracting to convey, he could not have compelled Streeter to perform. It follows, then, from the previous construction of the statute referred to, that Streeter cannot compel him to specifically perform, but should be remitted to his action for damages. (For a case parallel on the option feature and somewhat analogous on the question of the remedy, see Smith v. Bangham, 156 Cal. 359, 28 L.R.A.(N.S.) 522, 104 Pac. 689).

What is said above is said in the light of the previous construction of the statute by this court, which treats the rule requiring mutuality of remedy as being one of reciprocity. It may be that, for practical purposes, the rule should be considered as satisfied when, at the end of the suit, the defendant may have the full benefit of the plaintiff's performance of his contract. But the question does not seem to be an open one in this state. I therefore concur in the reversal for the reasons above indicated.

CHRISTIANSON, Ch. J. I concur in the opinion prepared by Mr. Justice Birdzell.